# 𝕴𝖓 𝖙𝖍𝖊
# 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘
## FOR THE SECOND CIRCUIT

_____

AUGUST TERM 2023
No. 23-1080

**KEITH SCHIEBEL,**
*Plaintiff-Appellant,*

v.

**SCHOHARIE CENTRAL SCHOOL DISTRICT,
KRISTIN DUGUAY, AND DAVID BLANCHARD,**
*Defendants-Appellees.*[*]

_____

On Appeal from the United States District Court
for the Northern District of New York

_____

ARGUED: MARCH 6, 2024
DECIDED: NOVEMBER 1, 2024

_____

Before:      WALKER, NARDINI, and MENASHI, *Circuit Judges.*

Plaintiff-Appellant Keith Schiebel appeals the judgment of the district court dismissing his claim under Title IX. Schiebel alleges that Defendant-Appellee Schoharie Central School District discriminated

_____

[*] The Clerk of Court is directed to amend the caption as set forth above.

against him on the basis of sex by conducting a Title IX investigation that found that he sexually harassed a student when he reached around her to retrieve supplies from a cabinet. We conclude that Schiebel plausibly alleges that the school district violated Title IX. The complaint states a Title IX claim under either of two theories. First, the allegations indicate that the school district was deliberately indifferent to the truth or falsity of the accusations against Schiebel because its investigation was so deficient as to constitute a sham and its decision was inexplicable. Second, the allegations indicate that the school district affirmatively discriminated on the basis of sex because the Title IX coordinator exhibited sex-based bias against Schiebel. We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

———————

JARED K. COOK (Karen R. Sanders, *on the brief*), Tully Rinckey, PLLC, Rochester, NY, *for Plaintiff-Appellant*.

MATTHEW MEHNERT, Guercio & Guercio LLP, Farmingdale, NY, *for Defendants-Appellees*.

———————

MENASHI, *Circuit Judge*:

Plaintiff-Appellant Keith Schiebel appeals the judgment of the district court dismissing his claim under Title IX against Defendant-Appellee Schoharie Central School District ("SCSD") and his claims under state law against Defendants-Appellees SCSD, Kristin DuGuay, and David Blanchard.

Schiebel is a veteran agriculture educator. In 2021, he brought the "Mobile Maple Experience"—a trailer with educational programming about the maple syrup industry—to the SCSD campus.

About a month later, SCSD Superintendent Blanchard informed Schiebel that the mother of a student had reported that Schiebel made her daughter feel uncomfortable during the program and that he would need to file Title IX paperwork. For several weeks thereafter, Schiebel asked to be informed of the specific allegations, and SCSD ignored his requests.

When SCSD finally agreed to discuss the matter with Schiebel, the meeting lasted about twenty-five minutes. Schiebel alleges that DuGuay, the Title IX coordinator of SCSD, was "hostile and accusatory" throughout the meeting. When Schiebel arrived, DuGuay told him that "her back was to the wall and she was aware of the exits" because she was scared of him. DuGuay then informed Schiebel of the accusations against him: A student had said that, during the maple syrup program, Schiebel "reached around her with two hands and had touched her breast and buttocks." Schiebel did not recall the complaining student or any such incident, but he said that it was possible that "he may have reached around a student at one point in the trailer to get something." After Schiebel made this statement, DuGuay abruptly ended the meeting.

Two weeks later, DuGuay determined that the sexual harassment allegation against Schiebel was well-founded. In a letter reporting the findings of her investigation, DuGuay explained that the student had "alleged conduct that, whether intentional or not … constitutes sexual harassment in violation of [school district] policy." DuGuay decided that the harassment occurred because Schiebel "did not deny that he 'may have reached around the Student' while attempting to reach for cups and supplies." As a sanction, the school district banned the Mobile Maple Experience from its campus for five years. Schiebel lost his job as a result of DuGuay's letter. Schiebel appealed the decision to Blanchard, who upheld it.

Schiebel then filed this lawsuit. He asserted a Title IX claim against SCSD, alleging that SCSD erroneously found that he committed sexual harassment because of its sex-based bias. He also asserted state law claims against SCSD, DuGuay, and Blanchard. The district court dismissed the Title IX claim, holding that although Schiebel had plausibly alleged that the finding was erroneous, he had not plausibly alleged that sex-based bias "was a motivating factor behind the erroneous finding." *Schiebel v. Schoharie Cent. Sch. Dist.*, 680 F. Supp. 3d 193, 202 (N.D.N.Y. 2023). The district court declined to exercise supplemental jurisdiction over the state law claims.

We conclude that Schiebel has plausibly alleged that SCSD discriminated against him on the basis of sex in violation of Title IX. The complaint states a Title IX claim under either of two theories. First, the allegations indicate that the school district was deliberately indifferent to the truth or falsity of the accusations against him because its investigation was so deficient as to constitute a sham grievance process and its decision was inexplicable. Second, the allegations indicate that the school district affirmatively discriminated against Schiebel because the Title IX coordinator exhibited bias against Schiebel based on his sex. We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

## BACKGROUND

The complaint alleges the following facts. Keith Schiebel has been an agriculture educator and maple syrup industry professional for over thirty years. On behalf of the New York State Maple Producers Association ("NYSMPA"), Schiebel developed the Mobile Maple Experience, a "trailer with educational presentations that shows the history and practice of using maple sap to make syrup and

other maple products." App'x 16 (¶ 67). Schiebel designed and built the Mobile Maple Experience, wrote grant proposals and lobbied to secure funding for it, and contacted hundreds of educators and lawmakers to schedule visits of the Mobile Maple Experience to schools. Schiebel himself conducted the programming, transporting the mobile exhibit more than 10,000 miles with his truck to educate thousands of students and other participants.

On June 2, 2021, Schiebel brought the Mobile Maple Experience to the SCSD campus on behalf of the NYSMPA. As part of the program, Schiebel directed ten high school students who made presentations for elementary school students. Many adults were present at the program, including the New York State Commissioner of Agriculture and Markets, two representatives from the Capital District Board of Cooperative Educational Services ("BOCES"), NYSMPA Executive Committee member Dwayne Hill, a school photographer, and more than thirty teachers and teachers' assistants. All the student presenters remained for the entire event, and the "event was completed, with nothing but praise by the participants." *Id.* at 17 (¶ 74).

On June 28, almost a month later, SCSD Superintendent David Blanchard emailed Schiebel to request that he "[p]lease contact the Superintendent's office at Schoharie regarding an issue a student addressed with the district while the Maple Experience was here on June 2nd." *Id.* (¶ 77). Schiebel called Blanchard several times that day and the next but could not reach him. On June 29, Blanchard called Schiebel and, in a conversation that lasted less than three minutes, told him that (1) the mother of a student had reported that Schiebel made her daughter feel "uncomfortable," (2) the mother "did not want any further action taken," and (3) Blanchard was nevertheless

required to file Title IX paperwork. *Id.* at 17-18 (¶¶ 80-82).[1] Blanchard then "abruptly ended the call" without informing Schiebel of the details of the alleged incident. App'x 18 (¶¶ 83-84).

On June 30, a representative of Capital District BOCES called Schiebel regarding upcoming Mobile Maple Experience visits that had been scheduled at Capital District BOCES schools. The representative informed him that, because of the incident at SCSD, the Mobile Maple Experience was no longer welcome at member schools if Schiebel took part in the presentations.

On July 1, Schiebel emailed Blanchard stating that he wanted to "better understand exactly what transpired" and requesting "any documentation/written reports" that SCSD had produced about the incident. *Id.* (¶ 89). Blanchard emailed back that he would follow up with Schiebel during the week of July 12. On July 12, Schiebel emailed Blanchard, again requesting documentation of the incident. On July 14, Blanchard responded by proposing a July 16 meeting on Zoom at which "I can get your side of the concern and then complete the Title IX document and send it to you." *Id.* at 19 (¶ 93). Schiebel agreed to meet but insisted that the meeting should be in person. Prior to the meeting, Schiebel was not informed of the specific allegations against him, provided with documentation, or informed that a Title IX investigation had begun.

The July 16 meeting lasted less than twenty-five minutes. The attendees were Schiebel, Blanchard, Assistant Principal and Title IX Coordinator Kristin DuGuay, and NYSMPA member Paul Perry. DuGuay was "hostile and accusatory" throughout the meeting. *Id.* at

---

[1] Although the complaint states that Blanchard called Schiebel on "July 29," the chronology of events indicates that the call occurred on June 29. App'x 17 (¶ 80).

22 (¶ 127). When Schiebel entered the room, DuGuay told him that this was a "serious matter" and that "her back was to the wall and she was aware of the exits because of her concerns about Schiebel." *Id.* at 20 (¶¶ 107-08).

DuGuay then explained the details of the investigation. A student's mother had called the day after the event and explained that her daughter did not want to go to school that day "because she was uncomfortable, because of the man in the trailer." *Id.* (¶ 112). The mother did not want the matter to proceed any further but DuGuay nevertheless opened an investigation. DuGuay questioned the student who, according to DuGuay, stated that Schiebel "had reached around her with two hands and had touched her breast and buttocks." *Id.* at 21 (¶ 114). DuGuay contacted one other witness—a student who was in the trailer at the time—who stated "that she had not seen anything like the complainant described." *Id.* at 22 (¶ 134).

Schiebel did not recall any incident in which he reached around a student or even remember who the complainant was. It had been six weeks since the SCSD event, and Schiebel had visited nineteen different schools, interacting with more than 140 student presenters, over the previous few months. In attempting to understand what might have happened, Schiebel speculated that "he may have reached around a student at one point in the trailer to get something" because many of the supplies were kept in a cabinet where students had been setting up the display for the presentations. *Id.* at 21 (¶¶ 119-20). He did not admit that "he reached around a student with two hands" or that "he had even accidentally touched a student's breast or

buttocks." *Id.* (¶¶ 121-22). [2] DuGuay did not ask Schiebel any questions about using two hands or an accidental touching. Instead, shortly after Schiebel stated that he may have reached around a student, DuGuay abruptly ended the meeting.

On July 30, 2021, DuGuay sent a letter to the NYSMPA, with a copy to Schiebel, reporting the findings of her investigation.[3] The letter explained:

> As a result of this investigation, which included interviews with Mr. Schiebel, the Student, the Student's mother, and another student who was assisting with the Maple Experience that day, I have determined that the allegations in the Complaint are founded. The Student alleged conduct that, whether intentional or not, was unwelcome and had the effect of substantially or unreasonably interfering with the Student's participation in an educational/extracurricular activity, and/or created an intimidating, hostile, or offensive learning environment. When asked whether he recalled this incident, Mr. Schiebel did not deny that he "may have reached around the Student" while attempting to reach for cups and supplies. Based on the totality of the circumstances, my investigation determined that this conduct constitutes sexual harassment in violation of Board policy.

---

[2] DuGuay also accused Schiebel of telling female students to make things "look pretty"—to which Schiebel responded that he said only to make the displays look pretty. App'x 22 (¶¶ 125-26).

[3] The letter and other communications between Schiebel and the defendants were introduced as exhibits to the defendants' motion to dismiss.

App'x 88. As a sanction for the sexual harassment, the school district banned the Mobile Maple Experience from visiting the SCSD campus for five years. After the five-year period, "before it may be permitted back on District property," the Mobile Maple Experience would need to install cameras in the trailer and ensure that additional adult observers were "present in the trailer whenever students are present." *Id.* at 89. Shortly after the NYSMPA received the letter, the NYSMPA terminated all of its contracts with Schiebel.

On August 13, 2021, Schiebel appealed DuGuay's findings to Blanchard. Blanchard upheld the findings in his own letter. In that letter, Blanchard concluded that Schiebel's "failure and/or inability to deny these allegations makes it more likely than not that the conduct occurred as alleged." *Id.* at 96. Blanchard rejected Schiebel's contention that his purported non-denial was merely an "attempt to consider whether it is even possible that he brushed up against a student during setup in the tight quarters of the exhibit trailer." *Id.* That explanation was not credible, according to Blanchard, because Blanchard had "personally called Mr. Schiebel on June 28, 2021 to notify him of the Complaint and to inform him that the District would be conducting an investigation," so Schiebel "had ample time prior to [the] meeting … to consider the accuracy of the allegations against him and to respond to the best of his knowledge." *Id.* Blanchard modified the sanctions DuGuay had imposed, however, to permit the Mobile Maple Experience to visit the SCSD campus as long as Schiebel was not "present on school grounds." *Id.*

On October 26, 2022, Schiebel filed this lawsuit against SCSD, alleging sex discrimination in violation of Title IX. The complaint also asserted three state law claims against SCSD, DuGuay, and Blanchard. The district court dismissed the Title IX claim based on its conclusion that Schiebel had failed to plausibly allege that "gender

bias was a motivating factor for the erroneous outcome" of the Title IX investigation. *Schiebel*, 680 F. Supp. 3d at 202. The district court declined to exercise supplemental jurisdiction over the state law claims in light of its dismissal of the federal claim.

## STANDARD OF REVIEW

"We review a district court's grant of a motion to dismiss *de novo*, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Henry v. County of Nassau*, 6 F.4th 324, 328 (2d Cir. 2021) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A complaint alleging a violation of Title IX "is sufficient with respect to the element of discriminatory intent … if it pleads specific facts that support a minimal plausible inference of such discrimination." *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016); *see also Roe v. St. John's Univ.*, 91 F.4th 643, 652 (2d Cir. 2024). We have explained that the *McDonnell-Douglas* framework—which affords to a Title IX plaintiff an initial "temporary 'presumption' of discriminatory motivation" at the motion-to-dismiss stage, *Columbia Univ.*, 831 F.3d at 54 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015))—"reduces the plaintiff's pleading burden, so that the alleged facts need support only a minimal inference of bias," *id.* at 56.

## DISCUSSION

"Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). The statute provides that "[n]o person in the United States

shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute expressly provides for enforcement only by the government, *see id.* § 1682, but the Supreme Court has recognized an implied private right of action for injunctive relief and monetary damages, *see Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992). Because Title IX imposes a condition on the receipt of federal funds, however, a plaintiff may obtain damages only when "the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999); *see Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 57-58 (2d Cir. 2023) (Menashi, J., concurring) (describing the derivation of this rule from the *Pennhurst* doctrine).

Title IX claims for monetary damages fall into two categories. First, damages are available if the funding recipient affirmatively discriminates through an official action or official policy, such as the "disparate provision of programs, aid, benefits or services or inequitable application of rules or sanctions." *Hayut v. SUNY*, 352 F.3d 733, 750 (2d Cir. 2003)*; see also Soule*, 90 F.4th at 52 (majority opinion) (noting that "in cases 'that do not involve official policy' of the school receiving federal funding, private damages are unavailable" unless there is deliberate indifference) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

Second, damages are available for acts of discrimination by private individuals within the recipient's program if "an official with authority to act on the school's behalf has 'actual knowledge of [the] discrimination in the recipient's programs' and is deliberately indifferent." *Soule*, 90 F.4th at 52 (quoting *Gebser*, 524 U.S. at 290).

The premise of a deliberate indifference claim is that a recipient that has actual notice of discrimination and the ability to take corrective action but fails to do so has made "an official decision … not to remedy the violation." *Gebser*, 524 U.S. at 290; *see also Soule*, 90 F.4th at 59 (Menashi, J., concurring) (explaining that the Supreme Court "confined the deliberate indifference framework to cases … that do not involve official policy of the recipient entity" because only in such cases is there "reason to require notice, opportunity to cure, and deliberate indifference in order to establish the equivalent of an official decision by the recipient") (internal quotation marks omitted). In this way, a showing of deliberate indifference establishes that the recipient "itself intentionally acted in clear violation of Title IX" by "subjecting" students and faculty within its program to "the discriminatory misconduct of their peers." *Davis*, 526 U.S. at 639, 642, 646 (alteration omitted); *see also Delgado v. Stegall*, 367 F.3d 668, 671 (7th Cir. 2004) (Posner, J.) ("Deliberate indifference means shutting one's eyes to a risk one knows about but would prefer to ignore. It thus corresponds to the criminal definition of recklessness, which the law treats as the equivalent of intentionality.") (citations omitted).

## I

A recipient's inadequate response to allegations of sexual misconduct within its program may give rise to a Title IX claim by the accusing party (the "complainant") or by the accused party (the "respondent"). Both complainants and respondents may assert claims under an official action theory or a deliberate indifference theory.

## A

A person who was subjected to sexual harassment or other misconduct within a recipient's program may allege a Title IX violation under either an official action theory or a deliberate

indifference theory. *Cf. Hayut*, 352 F.3d at 750 (noting that sexual harassment is sex discrimination) (citing *Franklin*, 503 U.S. at 75). A complainant may allege discrimination by the recipient through an official action—such as the recipient's retaliation against students who file complaints about sex discrimination or the recipient's official policy that discriminates on the basis of sex. *See Jackson*, 544 U.S. at 183 ("[R]etaliation presents an even easier case than deliberate indifference. It is easily attributable to the funding recipient, and it is always—by definition—intentional. We therefore conclude that retaliation against individuals because they complain of sex discrimination is 'intentional conduct that violates the clear terms of the statute.'") (quoting *Davis*, 526 U.S. at 642); *Soule*, 90 F.4th at 42 (majority opinion) (holding that Title IX plaintiffs had standing to challenge the recipient's "policy permitting high school students to participate on athletic teams consistent with their established gender identity"); *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) ("[A] funding recipient can be said to have intentionally acted in clear violation of Title IX when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient.") (internal quotation marks and citation omitted).

A complainant may also allege discrimination by showing that the funding recipient was "deliberately indifferent to known acts of [sex] discrimination" by third parties within its program, such as "sexual harassment, of which [the recipient had] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 643, 650; *see also*

*Plummer v. Univ. of Houston*, 860 F.3d 767, 777 (5th Cir. 2017) ("[A] recipient of federal funding[] can be held liable for intentional discrimination on the basis of sex or for deliberate indifference to discrimination against or harassment of a student on the basis of sex.").[4] When the alleged discrimination is, for example, a student harassing another student, "only deliberate indifference to such harassment can be viewed as discrimination by school officials themselves" and allows the discriminatory conduct to be attributed to the recipient. *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 140 (2d Cir. 1999).

To qualify as deliberately indifferent, the recipient's "response to sex discrimination must be 'clearly unreasonable' in light of known circumstances." *Papelino v. Albany Coll. of Pharmacy*, 633 F.3d 81, 89 (2d Cir. 2011) (quoting *Davis*, 526 U.S. at 648). In considering whether a recipient's response to a complaint of sexual misconduct is unreasonable, a court will consider both "the timeliness [and the] nature of the response." *Hayut*, 352 F.3d at 751. A complainant might establish deliberate indifference by showing that the recipient "knowingly refused to take any action in response to the behavior, such as investigating or putting an end to the harassment," *Papelino*, 633 F.3d at 90 (internal quotation marks and alterations omitted), or

---

[4] Title IX prohibits "deliberate indifference to discrimination." *Gebser*, 524 U.S. at 290. Because "sexual harassment is discrimination in the school context under Title IX, … student-on-student sexual harassment, if sufficiently severe, can … rise to the level of discrimination actionable under the statute." *Davis*, 526 U.S. at 650 (internal quotation marks omitted). Deliberate indifference to such harassment is actionable under Title IX when the harassment is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," *id.*—that is, when the harassment rises to the level of discrimination.

that the response "only follow[ed] after a lengthy and unjustified delay," *Hayut*, 352 F.3d at 751 (internal quotation marks omitted).

A complainant might also allege that the grievance process was so clearly irregular as to indicate that the process was a "sham." *Cavalier v. Cath. Univ.*, 513 F. Supp. 3d 30, 51 (D.D.C. 2021); *see Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019); *St. John's Univ.*, 91 F.4th at 660. Procedural irregularities such as the recipient's failure to comply with its own grievance policies or with applicable Title IX regulations provide probative evidence of deliberate indifference,[5] and a "wholesale failure to employ established procedures for investigating sexual harassment complaints" might establish it, *Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 211 (D.N.H. 2009).[6]

---

[5] *See, e.g.*, *Doe v. Yeshiva Univ.*, 703 F. Supp. 3d 473, 494 (S.D.N.Y. 2023) (explaining that "the initial dismissal of Doe's Title IX complaint without a statement of reasons and an opportunity to appeal may support the claim of deliberate indifference" because "Doe was entitled, under both [the university's] Policy and the Title IX regulations, not just to notice that [the university] had dismissed her Title IX complaint, but also to a statement of the reasons for that dismissal and a chance to appeal it"); *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 659 (W.D. Tex. 2017) ("While the Court agrees that a school's failure to comply with certain DOE guidelines generally cannot, alone, demonstrate a school's deliberate indifference, it also agrees with numerous courts that DOE regulations may still be consulted when assessing the appropriateness of a school's response to reports of sexual assault.") (citation omitted).

[6] In *Gebser*, the Supreme Court said that a recipient's failure to comply with regulations that required it "to 'adopt and publish grievance procedures providing for prompt and equitable resolution' of discrimination complaints and to notify students and others that 'it does not discriminate on the basis of sex in the educational programs or activities which it operates'" did not "establish the requisite actual notice and deliberate

This same framework applies to a person accused of sexual misconduct who alleges that the recipient discriminated through improper discipline or sanctions. Such a respondent may state a Title IX claim by alleging that the recipient discriminated "on the basis of the plaintiff's sex when disciplining the plaintiff." *St. John's Univ.*, 91 F.4th at 652; *see also* 34 C.F.R. § 106.31(b) ("[A] recipient shall not, on the basis of sex … [s]ubject any person to separate or different rules of behavior, sanctions, or other treatment."). Here too, a respondent may establish a Title IX violation based on either an official action or deliberate indifference.

First, a respondent may allege that the recipient affirmatively discriminated on the basis of sex in its own official actions leading to the imposition of discipline. To do so, the plaintiff must show that

---

indifference." 524 U.S. at 291-92 (citations omitted) (quoting 34 C.F.R. §§ 106.8(b), 106.9(a) (1997)). In that case, however, the school lacked actual notice of the sexual harassment, so the regulatory failures of the school could not establish deliberate indifference to acts of which the school was unaware. We have held that when the recipient has actual notice of the discrimination, the procedural regularity of the recipient's response—such as whether it addressed the discrimination by following established procedures—is probative of deliberate indifference. *See Hayut*, 352 F.3d at 751 (concluding that a university's response did not "amount[] to deliberate indifference" because it proceeded "in a timely manner, and in accordance with all applicable procedures"); *see also McGrath v. Dominican Coll.*, 672 F. Supp. 2d 477, 489 (S.D.N.Y. 2009) (noting that *Gebser* "did not address failure to 'follow' procedures"); *Yeshiva Univ.*, 703 F. Supp. 3d at 494 (explaining that "Doe has alleged specific deficiencies in [the University's] response to and investigation of her Title IX complaint, including important investigative leads that the University and its investigator did not pursue, amounting to unreasonable conduct" and therefore "deliberate indifference").

sex-based bias was "a motivating factor in the [recipient's] decision to discipline." *St. John's Univ.*, 91 F.4th at 652 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). We have described factual scenarios that would indicate such discrimination—such as the "erroneous outcome" and "selective enforcement" theories of discrimination—but those theories are not "the only ways in which a plaintiff may show that a university's disciplinary proceedings exhibit sex-based bias." *Id.* at 653 n.9. The "key inquiry [is] whether a plaintiff's allegations support a 'minimal plausible inference' that he was 'subjected to discrimination on account of sex in the imposition of … discipline.'" *Id.* at 666 (Menashi, J., dissenting) (quoting *Columbia Univ.*, 831 F.3d at 56).[7]

In the context of an official action claim, "procedural irregularity alone may suggest some form of bias" on the part of the recipient, but a plaintiff must also allege facts suggesting that the "bias was on account of sex." *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 107 (2d Cir. 2022) (internal quotation marks and alteration omitted). A respondent might allege, for example, that the recipient had a motive to discriminate on the basis of sex—such as public pressure to

---

[7] *See also Doe v. Purdue Univ.*, 928 F.3d 652, 667-68 (7th Cir. 2019) (Barrett, J.) ("All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student. We prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] 'on the basis of sex'?"); *accord Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020); *Sheppard v. Visitors of Va. State Univ.*, 993 F. 3d 230, 236 (4th Cir. 2021); *Overdam v. Tex. A&M Univ.*, 43 F.4th 522, 528 (5th Cir. 2022); *Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020); *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020); *Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021); *Doe v. Samford Univ.*, 29 F.4th 675, 687 (11th Cir. 2022).

"favor the accusing female over the accused male in order to demonstrate its commitment to protecting female students from male sexual assailants." *Id.* at 106 (internal quotation marks omitted) (quoting *Menaker*, 935 F.3d at 32); *see also Columbia Univ.*, 831 F.3d at 57. Or a respondent might allege that a school official exhibited a sex-based bias when administering the disciplinary proceedings. *See Purdue Univ.*, 928 F.3d at 669 ("It is plausible that [the Title IX coordinator] and her advisors chose to believe Jane because she is a woman and to disbelieve John because he is a man. The plausibility of that inference is strengthened by a post that [a university center] put up on its Facebook page during the same month that John was disciplined … [that] could be understood to blame men as a class for the problem of campus sexual assault."). The procedural flaws suggest that the discipline was erroneously or selectively imposed—and thus indicate the presence of discrimination—and the additional evidence allows the inference that the discrimination was based on sex.

Second, a respondent may allege that the recipient discriminated through deliberate indifference. In such a case, the respondent must show that the recipient was deliberately indifferent to the truth or falsity of the accusations of sexual misconduct made against him.[8]

---

[8] The defendants in this case agree that such deliberate indifference violates Title IX. *See* Oral Argument Audio Recording at 46:12 (Judge Menashi asking counsel for defendants, "you did agree that if it were plausible that the school just was indifferent, deliberately indifferent to the truth or falsity of the accusations and just expelled [the respondent], that would be a violation of Title IX?" and counsel for the defendants responding, "yes, if there's a sham investigation then of course").

In a deliberate indifference claim, the plaintiff seeks to hold the recipient liable for failing to adequately respond to sex discrimination of which the recipient had actual knowledge. *Davis*, 526 U.S. at 650. We have recognized that a false accusation of sexual misconduct qualifies as such discrimination. In *Menaker*, we explained that when a complainant accuses the respondent not "of just any misconduct" but "of *sexual* misconduct," the "choice is significant, and it suggests that [the respondent's] sex played a part in her allegations." *Menaker*, 935 F.3d at 38. "A rational finder of fact could therefore infer that such an accusation was based, at least in part, on [the respondent's] sex." *Id.* Indeed, we said that "courts may find it easy to draw an inference of sex discrimination 'in most male-female' scenarios of malicious allegations of sexual harassment … because 'it is reasonable to assume those allegations would not have been made concerning someone of the same sex.'" *Id.* at 38 n.88 (alterations omitted) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).[9]

The malicious accuser's sex-based discriminatory "intent may be imputed to [the recipient]" when the recipient "controlled … the very complaint process by which she sought to effectuate her allegedly discriminatory intent" and the recipient effectively "implemented" the accuser's "discriminatory design." *Menaker*, 935 F.3d at 39. If a respondent plausibly alleges that he was targeted by a discriminatory accusation, and the recipient imposed discipline or sanctions under circumstances that indicate deliberate indifference to

---

[9] *Cf. Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 149 (2d Cir. 2014) (explaining that false charges of racial harassment made by white officers against a black officer "could be viewed by a reasonable observer as themselves racial harassment"); *Riggins v. Town of Berlin*, No. 23-868, 2024 WL 2972896, at *3 (2d Cir. June 13, 2024) (concluding that false accusations of sexual misconduct constitute sexual harassment).

the truth or falsity of the accusation, the respondent has stated a deliberate indifference claim under Title IX.

As with a deliberate indifference claim by a complainant, a respondent may show deliberate indifference through allegations that the recipient's grievance process was so "objectively deficient" that it cannot be said to have aimed at uncovering the truth, *St. John's Univ.*, 91 F.4th at 655 (majority opinion), or that its decision was so "inexplicable" that the same inference could be drawn, *id.* (quoting *Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020)); *see also Oirya v. Brigham Young Univ.*, 854 F. App'x 968, 971 (10th Cir. 2021) (recognizing that "the element of deliberate indifference" would be met when a respondent shows that the recipient "ignored his allegations that the accuser had lied"). A respondent states a deliberate indifference claim when he plausibly alleges facts that raise "grave doubts as to the merits of the decision itself," *St. John's Univ.*, 91 F.4th at 656 (internal quotation marks omitted), and that the recipient knowingly "shut[] [its] eyes to [the] risk" that it was imposing sanctions based on a malicious and therefore discriminatory accusation, *Delgado*, 367 F.3d at 671.[10]

_____

[10] We recognize that the Sixth Circuit has said that "[t]he deliberate-indifference theory was designed for plaintiffs alleging *sexual harassment*," which "is a form of discrimination for purposes of Title IX," and that "to plead a Title IX deliberate-indifference claim, 'the misconduct alleged must be sexual harassment,' not just a biased disciplinary process." *Doe v. Baum*, 903 F.3d 575, 588 (6th Cir. 2018) (quoting *Doe v. Miami Univ.*, 882 F.3d 579, 591 (6th Cir. 2018)). Our circuit, however, has held that "malicious allegations of sexual harassment" are also a form of "sex discrimination" like sexual harassment itself. *Menaker*, 935 F.3d at 38 n.88. Deliberate indifference to such discrimination in the recipient's program qualifies as discrimination by the recipient in the same way as deliberate indifference to harassment or other acts of discrimination.

## II

Applying this framework, we conclude that Schiebel has plausibly alleged that SCSD violated Title IX under either a deliberate indifference theory or an official action theory. First, the allegations state a deliberate indifference claim because SCSD's investigation was so procedurally deficient and the reasoning of its decision so dubious that a reasonable factfinder could conclude that SCSD was deliberately indifferent to the truth or falsity of the accusation. Second, the allegations state an official action claim because the Title IX coordinator exhibited a bias against men that, together with the procedural irregularities, "support[s] a minimal plausible inference" that Schiebel was "subjected to discrimination on account of sex in the imposition of … discipline." *Columbia Univ.*, 831 F.3d at 56.

## A

Schiebel has plausibly alleged a deliberate indifference claim. In conducting its investigation, SCSD did not provide Schiebel with even the rudiments of due process, such as timely notice of the specific allegations against him, an opportunity to review or to present evidence, and an unbiased decisionmaker. Moreover, in deciding that the accusation against Schiebel was well-founded, SCSD offered reasoning that was not only dubious but illogical. SCSD relied on Schiebel's statement that he may have reached around a student to get supplies from a cabinet—even though that statement was not an admission of sexual misconduct. SCSD also invoked a tendentious definition of sexual harassment—that a single, accidental, trivial contact qualifies as sexual harassment under the district's policy—that suggests SCSD was not impartially applying district policy.

Schiebel alleges clear procedural irregularities in SCSD's investigation and adjudication of the accusation against him. Among those irregularities, Schiebel notes that SCSD failed to comply with the Title IX regulations that required a funding recipient to follow certain grievance procedures and with the district's own policy—Board Policy 7551—pursuant to which it purportedly conducted the investigation and adjudication.

The Title IX regulations required SCSD to comply with certain procedural requirements for addressing complaints of sexual harassment. *See* 34 C.F.R. §§ 106.44, 106.45 (effective August 14, 2020, to July 31, 2024).[11] The Title IX regulatory "requirements do not purport to represent a definition of discrimination under the statute" but the requirements nevertheless "effectuate the statute's nondiscrimination mandate." *Gebser*, 524 U.S. at 292. That is because a grievance process "lacking principles of due process risks bias that in the context of sexual harassment allegations is likely to involve bias based on stereotypes and generalizations on the basis of sex." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30101 (May 19, 2020). The regulations accordingly provided that a "recipient's treatment of a complainant or a respondent in response

---

[11] In evaluating whether SCSD's investigation and adjudication of Schiebel exhibited procedural irregularities, we rely on "the operative regulations at the time" of SCSD's conduct in 2021. *Garcia v. Garland*, 64 F.4th 62, 67 n.3 (2d Cir. 2023). SCSD acknowledges that the regulations applied to its investigation and adjudication in this case. *See* Appellees' Br. 18 ("District policy and Title IX itself require a District to act when [it is] aware of an allegation of sexual misconduct.") (citing 34 C.F.R. § 106.45(b)(1)). Citations therefore refer to those operative regulations.

to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX." 34 C.F.R. § 106.45(a).

While the failure to follow a regulatory requirement does not automatically establish that a recipient has contravened Title IX, the violation of a procedural requirement is a "procedural irregularity" that "may suggest some form of bias." *Vengalattore*, 36 F.4th at 107. It is well-established that "procedural deficiencies" in the "investigation and adjudication" of a complaint of sexual misconduct raise the inference that the recipient was biased rather than impartial. *Menaker*, 935 F.3d at 31 ("[T]he procedural deficiencies in the university's investigation and adjudication of the sexual assault complaint raised an inference that the university was motivated, at least in part, by bias."); *see also Doe v. Univ. of S. Ind.*, 43 F.4th 784, 793 (7th Cir. 2022) ("[I]f procedural irregularities are sufficiently numerous, lopsided, and/or important, they can sometimes support an inference of sex discrimination."); *Univ. of Denver*, 1 F.4th at 831 ("John has raised a reasonable inference that the University's one-sided investigation establishes a prima facie case of sex discrimination."); *Oberlin Coll.*, 963 F.3d at 586 ("[C]lear procedural irregularities in the College's response to the allegations of sexual misconduct … will permit a plausible inference of sex discrimination.") (internal quotation marks omitted).

The Title IX regulations required SCSD's grievance process to meet certain "[b]asic requirements." 34 C.F.R. § 106.45(b)(1). Among those requirements was that the recipient must "[t]reat complainants and respondents equitably," must ensure that a "Title IX Coordinator, investigator, [or] decision-maker … not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent," and must operate under a "presumption that the respondent is not responsible for the alleged

conduct until a determination regarding responsibility is made at the conclusion of the grievance process." *Id.* § 106.45(b)(1)(i), (iii)-(iv). A recipient must also "[r]equire an objective evaluation of all relevant evidence … and provide that credibility determinations may not be based on a person's status as a complainant, respondent, or witness." *Id.* § 106.45(b)(1)(ii). Furthermore, a recipient must provide written notice of the allegations to the parties, and the notice must include "sufficient details known at the time and with sufficient time to prepare a response before any initial interview." *Id.* § 106.45(b)(2)(i).[12]

The Title IX regulations provided additional requirements for the recipient's investigation of a complaint. *See* 34 C.F.R. § 106.45(b)(5). The recipient must "[e]nsure that the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the recipient and not on the parties." *Id.* § 106.45(b)(5)(i). And the recipient must provide each party with "an equal opportunity" both to present witnesses and other evidence and to "inspect and review any evidence obtained as part of the investigation … so that each party can meaningfully respond to the evidence prior to conclusion of the investigation." *Id.* § 106.45(b)(5)(ii), (vi). A recipient must also "[c]reate an investigative report that fairly summarizes relevant evidence and, at least 10 days prior to … [the] time of determination regarding responsibility, send to each party … the investigative report in an electronic format or a hard copy, for their review and written response." *Id.* § 106.45(b)(5)(vii). Finally, the regulations provided that the decisionmaker "cannot be the same person(s) as the Title IX Coordinator or the investigator(s)." *Id.* § 106.45(b)(7)(i).

---

[12] SCSD's Board Policy 7551 similarly mandated a "prompt, equitable, and thorough investigation." App'x 11 (¶ 37).

None of these required procedures were followed in this case.

First, the Title IX coordinator's behavior reflected a "bias for or against complainants or respondents" or against Schiebel in particular, *id.* § 106.45(b)(1)(iii), and indicated that she had presumed Schiebel to be guilty before the investigation had concluded—and indeed before she had heard from Schiebel at all. *But see id.* § 106.45(b)(1)(iv) (requiring that a recipient's grievance process "[i]nclude a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process"). As Schiebel alleges, DuGuay was "hostile and accusatory" at her first and only meeting with him and said that "her back was to the wall and she was aware of the exits" given the threat that she had already concluded he posed. App'x 20-22 (¶¶ 108, 127). Schiebel also alleges that DuGuay abruptly ended the meeting shortly after Schiebel made a statement that DuGuay construed as an admission without permitting him to present his case. That does not reflect an "objective evaluation of [the] relevant evidence." 34 C.F.R. § 106.45(b)(1)(ii).

Second, SCSD did not provide written notice of the allegations to Schiebel with "sufficient details"—including "the conduct allegedly constituting sexual harassment"—and "with sufficient time to prepare response before [the] initial interview." *Id.* § 106.45(b)(2)(i). Blanchard did not notify Schiebel that there were any allegations against him until nearly four weeks after the student's mother called the school district. Even then, Blanchard withheld the details of the allegations and minimized the seriousness that SCSD ascribed to the allegations. SCSD ignored Schiebel's repeated requests to "better understand exactly what transpired" and to see "any documentation/written reports" about the incident, App'x 18 (¶¶ 89,

92), until SCSD confronted him with the allegations at the initial—and only—meeting at which he purportedly provided his response.

Third, SCSD did not give Schiebel an opportunity "to present witnesses … and other … exculpatory evidence," to "inspect and review any evidence obtained as part of the investigation," or to "meaningfully respond to the evidence prior to [the] conclusion of the investigation." 34 C.F.R. § 106.45(b)(5)(ii), (vi). He did not receive documentation of any of the relevant evidence—such as the student's mother's telephone call, the complaining student's testimony, or the testimony of the student witness—and was never able to respond to that evidence. He was confronted with the allegations at a meeting that lasted twenty-five minutes and that did not feature the complaining student or any of the witnesses. Before that meeting, SCSD never notified Schiebel that it was even conducting an investigation, so Schiebel certainly did not receive a meaningful opportunity to respond. After the meeting, SCSD never provided Schiebel with "an investigative report that fairly summarizes relevant evidence" for his "review and written response" before the determination of responsibility. *Id.* § 106.45(b)(5)(vii).

Fourth, SCSD did not meet its "burden of gathering evidence sufficient to reach a determination regarding responsibility." *Id.* § 106.45(b)(5)(i). SCSD interviewed only one other witness—another student—who stated that she had not seen anything like what the complaining student described. As Schiebel alleges, there were ten students helping Schiebel with the presentations—along with dozens of adults and many elementary school students who attended the program—whom SCSD could have interviewed but did not.

Fifth, SCSD violated the Title IX regulation requiring a separation between the investigator and the decisionmaker. Instead,

SCSD empowered "the same person[]" to be both "the Title IX Coordinator [and] the investigator" and the ultimate decisionmaker. *Id.* § 106.45(b)(7)(i); *see* App'x 88-89.

Taken together, these procedural irregularities indicate that SCSD's investigation was not "sufficient," "objective," or "impartial," 34 C.F.R. § 106.45(b), or "prompt, equitable, and thorough," App'x 11 (¶ 37).[13]

**2**

In concluding that the accusation was well-founded, DuGuay employed reasoning that was so unconvincing as to render her decision inexplicable. On July 30, 2021, DuGuay issued a letter containing the findings of the investigation. The letter explained:

---

[13] Schiebel argues that there were two additional procedural irregularities. First, Schiebel alleges that SCSD informed Capital District BOCES of the allegations before the July 16 meeting and before the investigation concluded; he argues that the disclosure indicates that the school district had presumed him to be guilty and that it violated the provisions of Board Policy 7551 that "complaints will be treated as confidentially and privately as possible" and that "any disclosure will be provided on a 'need to know' basis." App'x 11 (¶ 37). While the way in which SCSD disclosed the allegations to BOCES might have reflected a presumption of guilt, it would not necessarily be irregular to make some kind of disclosure to BOCES— which apparently was involved in coordinating the Mobile Maple Experience program at SCSD—that one of the students had made a complaint regarding the program. Second, Schiebel alleges that the student's mother requested that the matter not proceed any further but the district opened an investigation anyway. SCSD's policy, however, provides that it will investigate alleged incidents of harassment "even in the absence of a complaint." *Id.* (¶ 37); *see also* 34 C.F.R. § 106.30(a) (noting that "the Title IX Coordinator" may sign a formal complaint "requesting that the recipient investigate the allegation of sexual harassment").

As a result of this investigation, which included interviews with Mr. Schiebel, the Student, the Student's mother, and another student who was assisting with the Maple Experience that day, I have determined that the allegations in the Complaint are founded. The Student alleged conduct that, whether intentional or not, was unwelcome and had the effect of substantially or unreasonably interfering with the Student's participation in an educational/extracurricular activity, and/or created an intimidating, hostile, or offensive learning environment. When asked whether he recalled this incident, Mr. Schiebel did not deny that he "may have reached around the Student" while attempting to reach for cups and supplies. Based on the totality of the circumstances, my investigation determined that this conduct constitutes sexual harassment in violation of Board policy.

App'x 88. This purported explanation left the decision "sufficiently 'inexplicable' to warrant inferring" that the investigation was not aimed at uncovering the truth. *St. John's Univ.*, 91 F.4th at 655-56 (quoting *Oberlin Coll.*, 963 F.3d at 588). To begin with, the finding went "against the substantial weight of the evidence." *Univ. of Ark.*, 974 F.3d at 864. The only evidence that supported the allegations was the complaining student's apparent statement to DuGuay. The student's mother had told the district only that her daughter had felt "uncomfortable" but she "did not want any further action taken," suggesting that she did not regard the matter as serious enough to warrant further investigation. App'x 17-18 (¶¶ 81-82). The student witness stated that "she had not seen anything like the complainant described." *Id.* at 22 (¶ 134). Schiebel also observes that SCSD did not consider his record of twenty-five prior school visits without incident.

Moreover, DuGuay treated Schiebel's statement that he "may have reached around the Student" while attempting to retrieve supplies from a cabinet as an admission of guilt. But according to the complaint—which we must accept as true at this stage—Schiebel never admitted that he actually reached around a student, let alone that he used two hands or that he touched a student when doing so. Even drawing inferences *against* Schiebel—which we cannot do at this stage—his statement at most suggested that he could have accidentally brushed against a student when reaching for supplies. Such a statement still would not support a finding of sexual harassment because it does not describe unwelcome physical conduct "of a sexual nature." *Id.* at 10 (¶ 34) (Board Policy 7551). DuGuay's treatment of the statement as an admission—especially in light of Schiebel's allegation that DuGuay abruptly ended the meeting shortly after the statement without giving him an opportunity to explain— suggests that SCSD's objective was to reach a finding of responsibility rather than to determine what actually happened.

SCSD argues that the purported admission renders the outcome of the investigation uncontestable. Appellees' Br. 14. Any procedural irregularities did not matter, according to SCSD, because Schiebel "admittedly came into physical contact with the student in question," and the "fact that he did not necessarily admit inappropriate physical contact is not … dispositive." *Id.* at 14-15. According to the allegations of the complaint, however, Schiebel never admitted that he touched the student, let alone that he touched her in a sexual manner. And even if Schiebel had admitted to accidentally brushing against the student, that still would not have supported a finding of sexual harassment or the drastic sanction of a permanent ban from the SCSD campus.

DuGuay's letter relied on a tendentious definition of sexual harassment. Board Policy 7551 defined sexual harassment as "unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct or communication of a sexual nature when … [s]uch conduct and/or communication has the purpose or effect of substantially or unreasonably interfering with a student's academic performance or participation in an educational or extracurricular activity." App'x 10 (¶ 34). DuGuay's letter concluded that Schiebel had engaged in sexual harassment because the "alleged conduct … whether intentional or not, was unwelcome and had the effect of substantially or unreasonably interfering with the Student's participation in an educational/extracurricular activity, and/or created an intimidating, hostile, or offensive learning environment." *Id.* at 88. The letter did not refer to the portion of the district policy that defined sexual harassment as unwelcome conduct "of a sexual nature" or even purport to find that the evidence met that standard. The letter instead determined that Schiebel's conduct amounted to sexual harassment even if his conduct had been unintentional and even if he had reached for supplies in a nonsexual manner.

It is possible that, in some circumstances, unintentional conduct might qualify as sexual harassment.[14] But the conclusion that a single instance of inadvertent brushing against someone near a supply cabinet qualified as sexual harassment appears to be

---

[14] *Cf. Katz v. City of Aurora*, 85 F. Supp. 2d 1012, 1019 (D. Colo. 2000) ("The City's sexual harassment policy is not unconstitutional for including unintentional as well as intentional conduct. … Hostile work environment harassment occurs where sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment."), *aff'd*, 13 F. App'x 837 (10th Cir. 2001).

inconsistent with the district policy. *Cf. Lucas v. S. Nassau Communities Hosp.*, 54 F. Supp. 2d 141, 147 (E.D.N.Y. 1998) ("Harmless body contact of an inadvertent non-sexual nature falls outside the broadest parameters of sexual harassment."); *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 889 (7th Cir. 2004) ("Mattson was not sexually harassed when Cone's breast allegedly brushed against his arm on a single occasion."). The complaint plausibly alleges that DuGuay manipulated the policy to fit the evidence rather than impartially applied the policy.

The appeal process did not fix the inexplicable character of DuGuay's decision but compounded the problem. In affirming DuGuay's findings, Blanchard explained his decision as follows. First, Schiebel did not deny that he "put both of his arms around the Student to reach around her to retrieve supplies from a drawer" or that "he may have made contact with the Student's breasts and/or buttocks in doing so." App'x 96. Second, Schiebel's contention that his statement was an "attempt to consider whether it [was] even possible that he brushed up against a student" was not credible because Blanchard "personally called Mr. Schiebel on June 28, 2021 to notify him of the Complaint and to inform him that the District would be conducting an investigation," which means that Schiebel "had ample time prior to meeting with Ms. DuGuay … to consider the accuracy of the allegations against him and to respond to the best of his knowledge." *Id.* Third, the alleged conduct qualified as sexual harassment under Board Policy 7551, which defines sexual harassment as "unwelcome physical conduct of a sexual nature when such conduct has the purpose or effect of substantially or unreasonably interfering with a student's academic performance or participation in an educational or extracurricular activity." *Id.* (alterations omitted). The conduct "substantially or unreasonably"

interfered with the student's education because she "missed an entire day of school as a result of the incident." *Id.*

Blanchard thus continued to rely on Schiebel's non-admission as the primary evidence supporting SCSD's decision and on an interpretation of Board Policy 7551 according to which reaching for supplies qualified as sexual harassment. And Blanchard introduced a new error: He found that Schiebel's statement supported the finding of sexual harassment because Schiebel had received advance notice of the allegations and therefore "had ample time" prior to the July 16 meeting to "consider the accuracy of the allegations against him and to respond to the best of his knowledge." *Id.* But Schiebel plausibly alleges that he was never informed of the allegations against him before the meeting and did not have time to formulate a response.

We conclude that Schiebel has stated a deliberate indifference claim. He has alleged that the district's grievance process was so "objectively deficient" and its decision "sufficiently inexplicable" that a reasonable factfinder could conclude that SCSD ran a sham process because it was deliberately indifferent to the truth or falsity of the accusation. *St. John's Univ.*, 91 F.4th at 655 (internal quotation marks omitted). The alleged deficiencies in procedure and justification raise "grave doubts as to the merits of the decision itself," *id.* at 656 (internal quotation marks omitted), and indicate that the district knowingly "shut[] [its] eyes to [the] risk" that it was imposing sanctions based on a discriminatory accusation, *Delgado*, 367 F.3d at 671. In short, Schiebel plausibly alleges that SCSD had "actual notice" of discrimination—the allegedly unfounded accusation of sexual harassment—and exhibited "deliberate indifference" to it. *Gebser*, 524 U.S. at 292-93.

**B**

In addition to plausibly alleging a violation of Title IX based on SCSD's deliberate indifference, Schiebel has also plausibly alleged that SCSD violated Title IX through its own official action. To state an official action claim, the plaintiff's allegations must "support a minimal plausible inference" that the recipient "subjected [him] to discrimination on account of sex in the imposition of … discipline." *Columbia Univ.*, 831 F.3d at 56; *see also St. John's Univ.*, 91 F.4th at 652. A plaintiff may meet this minimal burden by alleging clear procedural irregularity—which alone "may suggest some form of bias"—and facts that "permit a plausible inference that the bias was on account of sex." *Vengalattore*, 36 F.4th at 107 (internal quotation marks and alteration omitted).

Schiebel has met that standard here. He has alleged not only clear procedural irregularities demonstrating bias, as detailed above, but also facts indicating that the biased procedures resulted from a sex-based bias against men. Schiebel alleges that the first and only time DuGuay met with Schiebel to investigate the accusation against him, DuGuay was "hostile and accusatory" and stated that "her back was to the wall and she was aware of the exits" because she perceived Schiebel as a threat to her safety. App'x 20-22 (¶¶ 108, 127). DuGuay's behavior allows the reasonable inference not only that she had prejudged the accusation against Schiebel but that she did so "based on invidious sex stereotypes." *Sassaman v. Gamache*, 566 F.3d 307, 314 (2d Cir. 2009). "[I]t is reasonable to infer a discriminatory state of mind from [DuGuay's] remark" that she needed to remain guarded when Schiebel was present; that remark plausibly reflected an assumption "that men have a propensity to sexually harass women." *Id.* Because DuGuay made the remark while conducting the investigation and adjudication on behalf of SCSD—"the allegedly

discriminatory act" that is the subject of this lawsuit—the remark "tended to 'show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.'" *Id.* (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 116 (2d Cir. 2007)). Given that the remark was made by the person who decided on behalf of SCSD to find Schiebel responsible for sexual harassment, it "could reasonably be construed, furthermore, as explaining why that decision was taken." *Id.* (quoting *Tomassi*, 478 F.3d at 116).

We have held that a decisionmaker's "alleged comment on the propensity of men to engage in sexual harassment" and the defendants' "arguable failure to investigate properly the charges of sexual harassment" lodged against a male respondent were "sufficient to permit a jury to infer discriminatory intent." *Id.* at 315. So too here.[15]

SCSD argues that DuGuay's conduct may have indicated that she was biased against those accused of sexual harassment—that is,

---

[15] Schiebel additionally alleges that the district faced pressure to discriminate against men accused of sexual misconduct from government policy, such as the 2011 Dear Colleague letter, and from activism surrounding the then-ongoing sexual harassment controversy involving Governor Andrew Cuomo. We have said that "when combined with clear procedural irregularities in a [recipient's] response to allegations of sexual misconduct, even *minimal* evidence of pressure on the [recipient] to act based on invidious stereotypes will permit a plausible inference of sex discrimination." *Menaker*, 935 F.3d at 33. Evidence of such pressure is important in the absence of direct evidence that the recipient relied on such stereotypes. Because we agree with Schiebel that DuGuay's conduct as the decisionmaker provides direct evidence of SCSD's sex-based discriminatory intent, we need not decide whether the public pressure on SCSD would be sufficient, in the absence of that direct evidence, to permit a plausible inference of sex discrimination.

respondents—but did not necessarily indicate that she was biased against men on the basis of sex. According to SCSD, plausible allegations that the outcome of the investigation was prejudged do not "necessarily mean that the outcome was the result of gender bias" because such allegations may indicate "a preference to believe the victim." Appellees' Br. 18.

That interpretation of the allegations in this case amounts to an admission that the "Title IX Coordinator, investigator, [and] decision-maker" conducting the investigation and adjudication on behalf of SCSD exhibited a "bias for or against complainants or respondents generally" and failed to adopt a "presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion" of the investigation. 34 C.F.R. § 106.45(b)(1)(iii), (iv). In other words, SCSD conducted a biased rather than an impartial investigation. Even assuming that an "anti-respondent bias" can be distinguished from an "anti-male bias" here,[16] the presence of such a bias would represent a serious procedural irregularity—and it would suggest that the recipient was deliberately indifferent to the truth or falsity of the accusation it was purportedly investigating.

At this stage, however, the allegations of DuGuay's conduct raise a reasonable inference that she discriminated against Schiebel on the basis of sex. On a motion to dismiss, we must "draw reasonable inferences *in favor of* the sufficiency of the complaint." *Columbia Univ.*,

---

[16] The viability of this distinction, as a general matter, has been questioned. *See St. John's Univ.*, 91 F.4th at 671 (Menashi, J., dissenting) ("[A]n anti-respondent bias *is* a sex-based bias."); *Oberlin Coll.*, 963 F.3d at 587 ("[T]he 100 percent responsibility rate—in cases where most if not all the respondents were male—supports an inference regarding bias in the hearings themselves."). But we need not resolve the issue here.

831 F.3d at 57. The plausibility standard "does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Id.*; *see Iqbal*, 556 U.S. at 678 (2009) ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.") (quoting *Twombly*, 550 U.S. at 556).

We have previously rejected the argument on which SCSD relies. In *Columbia University*, we concluded that the plaintiff had plausibly alleged that university administrators who committed procedural irregularities in the imposition of discipline were "motivated in those actions by pro-female, anti-male bias." 831 F.3d at 56. The university argued that the allegations did "not support an inference of intentional sex discrimination" because "any motivation on the part of the [disciplinary] panel to demonstrate that it takes [sexual misconduct] complaints seriously is not the same thing as a motivation to discriminate against an accused male student." *Id.* at 57. In other words, the administrators might have exhibited a "bias in favor of Jane Doe," the complainant, because of an anti-respondent or a pro-complainant bias that was not based on sex. We said that adopting such an explanation was improper on a motion to dismiss because "[i]t is not the court's function in ruling on a motion to dismiss for insufficiency of the complaint to decide which was the defendant's true motivation" as opposed to which inferences are reasonable. *Id.* at 57 n.10.

In this case, adopting SCSD's argument would require us to conclude that the *only* reasonable inference to be drawn from DuGuay's conduct is that she was biased against anyone accused of sexual misconduct—male or female—and that she would have

expressed the same fear for her safety in the presence of a female respondent as she did with Schiebel. We do not agree that this is the only reasonable inference—or even the most reasonable inference—that may be drawn from the allegations. Title IX, like Title VII, "requires that, in the course of investigating [sexual misconduct] claims, [recipients] do not presume male [respondents] to be 'guilty until proven innocent' based on invidious sex stereotypes." *Sassaman*, 566 F.3d at 314. Schiebel's allegations raise the plausible inference that the Title IX coordinator conducting his investigation did just that, and as the decisionmaker for SCSD her discriminatory conduct reflects an official action by the district. *Cf. Columbia Univ.*, 831 F.3d at 58-59 ("[A] defendant institution is not shielded from liability for discrimination practiced by an employee endowed by the institution with supervisory authority or institutional influence in recommending and thus influencing the adverse action by a non-biased decision-maker.").

### III

Schiebel also asserted three state law claims against SCSD, Blanchard, and DuGuay: tortious interference with contract, negligent infliction of emotional distress, and reckless and wanton misconduct. The district court dismissed these claims without prejudice, declining to exercise supplemental jurisdiction following its dismissal of the federal claim. Because we reverse the dismissal of the Title IX claim, however, "we also vacate the dismissal of [Schiebel's] state law claims to allow the district court to reconsider whether to exercise supplemental jurisdiction over these claims." *Barnes v. City of New York*, 68 F.4th 123, 133 (2d Cir. 2023).

## CONCLUSION

Schiebel's complaint plausibly alleges that SCSD discriminated against him on the basis of sex in violation of Title IX. We reverse the judgment of the district court insofar as it dismissed Schiebel's Title IX claim, vacate the judgment insofar as it dismissed his state law claims, and remand for further proceedings consistent with this opinion.